Filed 9/26/22 In re D.R. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re D.R., et al., Persons Coming Under the Juvenile Court Law. | B315904 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.R.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 18CCJP02379A–B |

APPEAL from an order of the Superior Court of Los Angeles County, Hernan D. Vera, Judge. Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Leslie R. (mother) appeals from the juvenile court's order terminating her parental rights as to two of her children, D.R. and A.R. Mother argues the court erred in terminating her parental rights because the court considered inappropriate factors when it found the beneficial parent-child relationship exception to adoption did not apply. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. Background

Two of mother's children, D.R. (now 12 years old) and A.R. (now five years old), are involved in this appeal.[1] The Department of Children and Family Services (Department) became involved with this family on March 12, 2018, after receiving an anonymous report that mother uses methamphetamines and hears voices. The caller expressed concern for the children's safety in mother's care. At the time, mother and the children were living with the maternal uncle, H.R., his partner, and several other extended family members.

On March 29, 2018, during the initial investigation period, mother and the children appeared at a Department office for an interview. Mother displayed signs of being under the influence during the interview but denied current or past drug use. With mother's consent, the Department social worker contacted H.R.,

---

[1] The children's fathers are not involved in this appeal.

who agreed to participate in a safety plan for the children. The safety plan provided that H.R. would care for the children and mother would not be allowed to reside in his home. Further, H.R. was to obtain a restraining order against mother. Mother agreed to drug test.

Over the next several days, mother repeatedly appeared at the home of H.R. while intoxicated or under the influence of methamphetamines. Mother was belligerent and demanded custody of the children. On April 3, 2018, mother went to H.R.'s home while intoxicated and punched the front window, causing the glass to shatter. A child in the home was hit by flying glass and was mildly injured. Mother did not appear for drug testing as requested by the Department. On April 9, 2018, mother went to H.R.'s home again and appeared to be under the influence of methamphetamine and alcohol. H.R.'s family attempted to stop mother from putting the children in her car but were unable to do so. Law enforcement intervened. The following day, mother returned to H.R.'s home and was arrested for trespassing. The children were detained from mother on April 10, 2018, and placed with H.R. The court ordered monitored visitation by a neutral monitor. H.R. obtained a restraining order prohibiting mother from visiting his residence.

## 2.    Jurisdiction and Disposition

The Department filed a petition under Welfare and Institutions Code section 300, subdivisions (a), (b), and (j),[2] alleging that mother's substance abuse rendered her unable to

---

[2] All undesignated statutory references are to the Welfare and Institutions Code.

provide care for the children, that mother had physically abused D.R., that such physical abuse also placed A.R. at risk of abuse, and that mother has a history of engaging in violent conduct in the presence of the children.

In a report submitted on May 15, 2018, the Department stated that H.R., D.R., and other family members had observed mother engaging in violent conduct with other family members including H.R., and had a history of methamphetamine and alcohol abuse. D.R. also reported that mother would hit him with a shoe or a belt on his bottom, back, and arms if he "did something [he's] not supposed to do." Other family members did not observe or see signs of physical abuse.

Mother was not in contact with the Department during this period and she was arrested on May 23, 2018, after going to H.R.'s home. During this reporting period, mother was allowed monitored visitation with the children for two hours twice a week in the presence of a Department-approved monitor. As of mid-May, mother had had one in-person visit with the children at a Department office and the Department was working with the family to establish a regular visitation schedule.

On June 28, 2018, the court sustained the following amended jurisdictional allegations under section 300, subdivision (b):

"b-1: The children['s] … mother … is a recent user of methamphetamine, which renders the mother incapable of providing the children with regular care and supervision. On prior occasions, the mother was under the influence of illicit drugs while the children were in the mother's care and supervision. The child [A.R.] is of such a young age that the child requires constant care and supervision and the mother's

4

substance abuse inhibits the mother's ability to provide constant care and supervision. Such substance abuse by the mother endangers the children's physical health and safety and places the children at risk of serious physical harm, damage and danger.

"b-2: On prior occasions, the children['s] mother … inappropriately physically disciplined the child [D.R.] striking the child's body with belts. Such inappropriate physical discipline was excessive and caused the child unreasonable pain and suffering. Such inappropriate physical discipline of the child by the mother endangers the child's physical health and safety and places the child and the child's sibling, [A.R.], at risk of physical harm."

The court also ordered the children removed from mother's custody with family reunification services. Mother's case plan required her to complete a full alcohol and drug rehabilitation program with aftercare, a 12-step program, and weekly drug testing. The case plan also required mother to complete a parenting class and engage in individual counseling. Finally, the court ordered monitored visitation with discretion for the Department to liberalize.

### 3. Six-Month Review

The Department submitted a six-month review report to the court in late December 2018. The children were still placed with the maternal uncle, H.R., and his partner and were doing well. Mother, however, continued to violate the restraining order prohibiting her from visiting H.R.'s home and was arrested four times during the review period. The Department confirmed that mother had enrolled in a drug rehabilitation program but was unable to confirm her compliance with the remainder of the case plan. Mother tested negative for substances twice in October but

otherwise was a "no show" for court-ordered drug testing. She went to a Department office at one point, without a scheduled appointment, and appeared to be under the influence as she was foaming at the mouth, using profanity, and engaging in frequent, uncontrolled eye-rolling.

The Department reported that mother had visited with the children regularly when she was not incarcerated. Mother needed to be prompted not to discuss case issues and other inappropriate matters with the children during visits. During one visit, mother became enraged that the monitor would not allow her to speak with D.R. privately. Mother ended the visit early. Otherwise, mother was appropriate with the children.

At the six-month review hearing on March 7, 2019, the court found that mother was in partial compliance with her case plan and ordered continued jurisdiction over the children.

## 4. Twelve-Month Review

In its 12-month review report, the Department indicated that the children had been placed with a foster family at H.R.'s request.[3] Both D.R. and A.R. were thriving in their new placement. Mother continued to struggle with case plan compliance during the review period and relapsed with drug use. Her behavior was erratic during those times and, in addition to violating H.R.'s protective order, mother was frequently rude and aggressive with the foster mother and Department personnel. Mother did complete a drug rehabilitation program and was participating in aftercare, drug testing, and an anger management class. She frequently tested negative for all

---

[3] The reason for the request is not disclosed in the record.

substances between mid-December 2018 and July 2019 but missed five test dates during that interval.[4] During this reporting period, mother visited the children regularly and was usually observed to be engaging appropriately with the children. One social worker commented that "the children appeared to be happy and well bonded" to mother. Due to mother's progress in her programs and negative drug test results, the Department transitioned to unmonitored visitation in early August 2019. D.R. conveyed that he would like to live with mother.

In two last-minute informations filed in October 2019, the Department expressed concern that mother had relapsed because she had not been attending her program and had not reported for drug testing that week. Mother had also alleged that the foster mother was mistreating the children, which D.R. and the foster mother denied. Mother's visitation with the children reverted to monitored visitation sessions due to the Department's uncertainty about mother's sobriety.

The court found that continued jurisdiction was necessary, that mother's compliance with the case plan was not substantial, and continued family reunification services for an additional six months.

5.    **Eighteen-Month Review**

In late March 2020, the Department filed its initial permanency review report.[5] At that time, the children remained at their foster home placement and continued to do well there.

---

[4] Mother was pregnant during some or all of this reporting period.

[5] Due to the Covid-19 pandemic, the 18-month review hearing did not take place until September 1, 2020.

Mother, however, continued to struggle. After the birth of her third child, mother was ordered to re-enroll in a drug treatment program but had only completed a few sessions. For the most part, mother was a "no show" for drug testing after August 2019. And mother had been arrested and incarcerated in late February 2020, after she assaulted her mother's boyfriend with an unknown weapon and used a metal pole to damage his car. The arrest report indicated that mother appeared to be under the influence of narcotics at the time. Mother was still incarcerated in late March, when the Department submitted its initial permanency review report.

As for visitation, the Department reported that the assigned social worker had attempted to increase mother's visitation days (she was only seeing the children for two hours on Saturdays) but mother had not been in contact with the Department to confirm a monitor or a schedule. In addition, mother had been "inconsistent" with visitation. Mother was briefly employed in December 2019 and claimed that she missed visitation sessions due to her work schedule. But she continued to miss scheduled visits after her employment was terminated and provided explanations such as, "I overslept," and "Something came up." When mother did visit with the children, she interacted well with them, and they were happy to see her. D.R. still reported that he wanted to live with mother. The Department recommended terminating family reunification services for mother.

The Department submitted an interim review report in mid-August 2020 and reported that the children continued to do well in the foster placement. Mother had not yet completed her second drug rehabilitation program and missed all ordered drug

tests during the previous six-month period. Mother seldom visited the children and on several occasions confirmed visitation but then did not appear for the visit. But when mother did visit with the children, they appeared happy and well bonded to her. The Department again recommended that the court terminate family reunification services for mother. Also during this period, the maternal uncle, H.R., and his partner contacted the Department and asked to have the children placed back in their home.

## 6. Termination of Parental Rights and Permanency Planning

On September 1, 2020, the court ordered mother's reunification services terminated and set the matter for a permanency planning hearing under section 366.26.

In early February 2021, the Department filed a permanency planning review report. The children had been placed back with H.R. since November 2020 and were happy and comfortable in the home and living with their extended family. D.R. expressed that he would like to continue to live with H.R.

The Department filed a permanency selection and implementation report on February 11, 2021. At that time, H.R. and his partner had expressed an interest in adopting the children. D.R. said he was very happy in the home and wanted H.R. and his partner to adopt him and his sister. The Department had initiated the appropriate evaluations and recommended adoption as the permanent plan for D.R. and A.R.

During the review period, prior to the children's placement with H.R., mother seldom visited the children. On several occasions, she confirmed a visitation session with a Department monitor but then did not follow through with the visit. When

mother did visit with the children, her interactions with them were positive and nurturing. After the children were placed back with H.R., mother had only two in-person visits but visited the children frequently via video chat. H.R., who was to monitor mother's visits with the children, expressed that it was difficult to accommodate her visits due to his work schedule. The Department social worker indicated that she could assist but that she did not have a phone number for mother. Mother had also not contacted the Department to arrange visitation.

On March 2, 2021, the court ordered adoption as the permanent plan for D.R. and A.R. and continued the permanency planning hearing for 60 days to allow the Department to complete its adoption assessment. The Department subsequently reported that H.R. and his partner had completed all requirements and were cleared to adopt the children. During an in-person visit, a Department social worker "observed that the relationship between A.R. and D.R. and the two applicants [H.R. and his partner] is strong, loving and characteristic of a healthy parent/child relationship."

In its final report, filed in early August 2021, the Department reported that D.R. and A.R. were thriving and happy in the home of H.R. The children had had a few phone calls with mother but did not have any visits with her in person. Mother had been incarcerated for several months. D.R. stated that he wanted to continue living with H.R. The Department continued to recommend adoption by H.R. and his partner as the permanent plan for the children.

On August 30, 2021, the court conducted a permanency planning review hearing and ordered adoption as the permanent plan. On September 22, 2021, the court conducted the final

hearing under section 366.26. The Department asked the court to terminate mother's parental rights and move forward with adoption as the permanent plan. Minors' counsel joined in the Department's request. Mother's counsel urged the court not to terminate mother's parental rights due to the beneficial relationship between her and the children, especially D.R. But mother presented no evidence or testimony at the hearing.

The court found the beneficial parent-child relationship exception did not apply and terminated mother's parental rights. The court ordered adoption to continue as the permanent plan and designated H.R. and his partner as the prospective adoptive parents.

Mother appeals.

## DISCUSSION

Mother asserts the court erred by finding the beneficial parent-child relationship exception to adoption does not apply. We disagree.

After a juvenile court terminates a parent's reunification services, " 'the focus [of the proceedings] shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) At that point, adoption becomes the preferred permanent plan for the child, and the court should order it "unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51, disapproved on an unrelated point by *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).) Indeed, section 366.26 requires the juvenile court to terminate parental rights if it finds by clear and convincing evidence that the child is likely to be adopted. (§ 366.26, subd. (c)(1).)

A parent may avoid termination of parental rights, however, by establishing that a statutory exception exists.

(*Caden C., supra*, 11 Cal.5th at p. 617.) One exception exists where there is a beneficial relationship between the parent and the child. (*Ibid*.) To establish the beneficial parent-child relationship exception, the parent must show, by a preponderance of the evidence, that she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and the relationship provides a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i).)

In *Caden C.*, the California Supreme Court clarified how this exception works. "The language of [the beneficial parent-child relationship] exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at p. 630.) To determine whether the beneficial parent-child relationship exception applies, "the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would

12

experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

The Supreme Court also clarified that a parent's failure to make adequate progress with her case plan or to address the issues that led to the child's dependency does not disqualify a parent from seeking to establish this exception. The parent's conduct during the period of supervision may be relevant to the quality of the parent-child relationship and the consequences of severing the relationship. (*Caden C., supra*, 11 Cal.5th at pp. 637–638.) But the critical question is whether the child's relationship with the parent is so significant that it outweighs the benefits of adoption, not whether the parent has satisfactorily addressed the issues that led to the child's proceedings. (*Id.* at pp. 635–636.)

Thus, to show the beneficial parent-child relationship exception applies, the parent bears the burden of establishing three elements: (1) regular visitation and contact with the child, taking into account the extent of visitation permitted; (2) the existence of a substantial, positive, emotional attachment between the child and the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and (3) that terminating the parent-child relationship would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C., supra*, 11 Cal.5th at p. 636.) To evaluate whether the exception applies, courts should look to several

factors, including the age of the child, the amount of time the child spent in the parent's custody, the quality of interaction between parent and child, and the child's particular needs. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) If the parent establishes all three elements, the exception applies, and the court should select a permanent plan other than adoption. (*Caden C.*, at pp. 636–637.)

We review the court's findings on the first two elements—regular visitation and whether the child would benefit from continuing the relationship—for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) As for the third element, we review factual determinations for substantial evidence and the weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion. (*Ibid.*) But where, as here, a parent contends the court below erred in finding she did not meet her burden of proof,[6] we must determine whether the evidence compels a finding in favor of the parent as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved of on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "Specifically, the question becomes whether the [parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*I.W.*, at p. 1528.)

---

[6] In *Caden C.*, unlike here, the juvenile court found the mother met her burden to establish the beneficial parent-child relationship exception, but the appellate court reversed the juvenile court's ruling. (*Caden C.*, *supra*, 11 Cal.5th at pp. 628–629.)

We begin our analysis with the first element: regular visitation and contact with the children. Mother provides no meaningful discussion on this issue, as she claims the court "found that Mother had visited the children." The record, however, is ambiguous on this point.

As mother notes, the court provided only a brief explanation of its ruling. Of course, the court was not required to make express findings when it concluded the beneficial parent-child relationship exception to adoption did not apply. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [noting juvenile court not required to recite specific findings when it concludes terminating parental rights would not be detrimental to the child].) But the comments the court did make do not lead to the conclusion mother advances, namely, that the court found she had consistently and regularly visited the children during the three-and-a-half year-long dependency proceeding. Specifically, in announcing its ruling that the beneficial parent-child relationship did not apply, the court stated, "Although the mother has visited, visits have not over the years risen as required by the law to a parental role that is needed for the exception to apply. And that even if it did, any benefit accruing to the children from the relationship to the [parent] is outweighed by the physical and emotional benefit the children will receive in the permanency and stability of adoption."

The court's statement that "mother has visited," taken in context, does not appear to be a finding in mother's favor on the first element. And in the face of an ambiguous record, we are bound to construe the court's ruling on "the visitation element in a manner that supports its order terminating [the parent's] parental rights." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069;

see also *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631 [noting a trial court's ruling is presumed correct and ambiguities are resolved in favor of affirmance].) Thus, we must presume the court found mother did not establish the regular visitation element.

Substantial evidence supports that implied finding. During the first few months of supervision, mother was allowed monitored visitation with the children for two hours twice a week but only had one in-person visit with the children. The Department's attempts to arrange additional visits were hampered by mother's refusal to provide a reliable telephone number and her frequent arrests and incarceration arising from violations of H.R.'s protective order. From mid-2018 to mid-2019, the Department reported that mother did visit the children regularly and had positive interactions with them—so long as she was not incarcerated, which happened with some frequency. In the fall of 2019, the Department suspected mother had a relapse regarding her drug use. After that point, mother's visitation was "inconsistent," according to the Department, and she frequently missed visits without a valid explanation, even after she had confirmed a visit with the monitor. For a time in late 2020 and early 2021, mother visited with the children virtually on a regular basis, but she almost never saw them in person. Although the Department offered to facilitate in-person visits, mother still did not have a reliable contact number and did not return calls or follow up with the Department regarding additional visitation. And in mid to late 2021, when the court terminated her parental rights, mother was having only occasional phone contact with the children due to her incarceration.

As noted, mother provides no analysis or discussion concerning the first element, other than to say, incorrectly, that the court found in her favor. She also provided no evidence at the hearing to support her argument that the beneficial parent-child relationship exception should be applied. Given that it is the parent's burden to establish the existence of an exception to adoption, we must conclude the court did not err in finding the beneficial parent-child relationship exception inapplicable in the present case.[7]

---

[7] Because we find mother failed to establish the first element of the beneficial relationship exception, we need not consider the other elements. (See *In re Eli B., supra*, 73 Cal.App.5th at p. 1068 [noting that where father failed to establish regular and consistent visitation, it was unnecessary to analyze the remaining elements of the exception].)

## DISPOSITION

The order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, Acting P. J.

WE CONCUR:


EGERTON, J.


ADAMS, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief
Justice pursuant to article VI, section 6 of the California Constitution.